(Cuyahoga County, O., Common Pleas.)

THE STATE OF OHIO, on Relation of M. A. FANNING. v. THE BOARD OF COMMISSIONERS OF CUYAHOGA COUNTY; ALBERT E. AKINS, as Auditor of Cuyahoga County, and M. A. LANDER, as County Treasurer of Cuyahoga County.

---

(1). The Brecksville board improvement— Classification of excavations— Specifications— "Earth", "hard pan", "loose rock" and "solid rock"—Definition of terms—Held, that the purpose of these various subdivisions was to group, under each subdivision, such material as would cost about the same for their removal, so that, under the head of earth, would be included those things which would cost about the same as earth, under the head hard-pan should be included such materials as would cost about the same for their removal, etc.

(2). Where public officers, as the county commissioners, acting in a representative capacity for the taxpayers, are mislead or about to be mislead and unlawfully to pay out the money of the taxpayers, or where the commissioners of the county have employed an engineer and clothed him with all the power possible for them to confer upon him, and made him the arbiter for all questions that they have the right to make him the arbiter of, if he makes a gross mistake or is mislead so far that he makes an estimate that is grossly unjust to the county and a wrong to the taxpayers thereof, a taxpayer may interfere and by action restrain the misapplication of public funds.

DISSETTE, J.

Waiving the reading of all of the formal matters in this petition, the relator brings this suit as a taxpayer of this county, asking that the defendants be enjoined from the payment of a certain estimate made to Miller, a contractor, and also a sum claimed by engineer Baker for services on what is known as the Brecksville road, and, after alleging that he had requested both the county solicitor and the county prosecutor to institute the present action and they had refused, thereby compelling the relator to bring the suit himself, he says: "That in 1896 the county commissioners instructed the county surveyor to prepare specifications for the improvement of the road known as the Brecksville road, and that the county surveyor did prepare specifications and reported the same to the county commissioners on the 12th day of September of that year; that the specifications contained a survey, profile and plans, and an estimate for said work; that afterwards another estimte was prepared, and he gives the figures of each estimate; and he says that on the last estimate, which did not differ materially from the first, bids were received but rejected, and in August, 1897, the said county surveyor made a fresh estimate which differed very

materially from either of the former in that it increased the amount of the earth excavation by about 40,000 to 45,000 yards, and decreased the hard-pan excavation by 11,000 cubic yards, and the loose rock by 20,000 to 21,000 cubic yards and the solid rock by 8,000 cubic yards." Complaining of the great disparity between these various specifications of the engineer, he says, in substance: That, by using the common methods of examination, well-known to engineers, the amount of the respective kinds of excavation could have been ascertained with very great certainty, and that the contract could have been let intelligently, and that Baker, the engineer, by neglecting to use those means which he had been instructed to use in his last specification, upon which the bids were received for the improvement, grossly over-stated the lower-priced kinds of excavation and under-stated the higher-priced kinds, and that, by reason of this, afforded an opportunity for bidders to bid much below a reasonable price on the lower-priced work and much above a reasonable price on the higher-priced work, so that the one that was actually the highest bidder, by adopting this method, would seem to be the lowest; and, by means of a favorable classification of the excavations, the cost of the improvement would be made to far exceed the estimated cost, and the contractor would really be among the highest bidders. And, after reciting the fact that the commissioners entered into a contract with one James M. Miller on the 4th day of September, 1896, on a bid made by one John L. Farley, and that that contract provided that the contractor should receive five cents for each cubic yard of earth excavation, and sixty cents for each cubic yard of hard pan, twenty-five cents for loose rock, and $1.25 for solid rock, the plaintiff alleges that if the classification made in the last preliminary estimate furnished by the engineer and which was the basis upon which it was determined who was the lowest bidder, had been correct, the cost of the improvement would have been only $14,900.

This, I understand, to be exclusive of the cost for services of the engineer.

The burden of the plaintiff's complaint is—without going into the detail which is set out fully and more particularly in the petition—that the entire cost of this improvement, exclusive of engineer's services, amount to $63,436.64.

In addition to that, the preliminary estimate made by the engineer for engineering service, was only $1,950; but that the engineer has now presented a claim for $5,382 for engineering, and $1,191 for inspectors.

He alleges that said Miller has been already grossly over-paid, under his contract. That the statements of the amounts and kinds of excavation made by the contractor, as contained in the various estimates, are grossly inaccurate; and that the county commissioners' attention was called to the facts at the time of filing the tenth estimate, and they were notified of the facts that the estimates of the amounts of the various kinds of excavation were grossly incorrect, and were such that Miller had already been grossly over-paid, and that nothing was due him, under said contract, by reason of the work already done; but that the commissioners went on and paid said tenth estimate, and that the engineer afterwards filed an eleventh estimate, and that under this estimate the said contractor Miller now demands the sum of $8,226.84. That, in short, the county commissioners have allowed this estimate, and have ordered the county auditor to draw his warrant upon the county treasurer for the payment thereof, and that the auditor will draw his warrant upon the county treasurer and the county treasurer will pay the same unless restrained by the order of this court. They say that for the several good and sufficient reasons hereafter mentioned, this court should grant an order restraining the payment of this money:

First: The relator claims that the law, under which this improvement was made, is unconstitutional, and, therefore, that the commissioners had no power or authority to enter into this contract.

Second: That this estimate contains, and is made up in part, of items for work which were contracted for by the county commissioners contrary to law

Third: Because one item charged in this estimate, for rolling and scraping the road-bed, is not a proper charge, being included in the general contract.

Fourth. Because the contractor has already been grossly over-paid.

Now, with reference to the first reason urged by the relator, to-wit, that the law, under which this improvement was made, is unconstitutional—I do not find it necessary to pass upon this question.

I regard the law itself as one of the most valuable and most important pieces of legislation that has been passed relating to county affairs, in the last quarter of a century—its purpose being to improve all the highways leading from the city to the limits of the county, and it was drawn pursuant to the request of representatives from each township at a meeting called for that purpose. Several of the leading highways have been constructed at the cost of the general taxpayers; and it would work an injustice now to those who have paid their proper share of the expense of building these roads and have derived no benefit therefrom, but are expecting the board of county commissioners in course of time to improve the highways in which they are particularly interested. It would work injustice to those taxpayers. Besides, I have some doubts, or I might say, a faint hope that the supreme court would so modify its opinion, if it were necessary, as to sustain this law.

The second reason why it is claimed that this estimate should not be paid, is, that it contains items contracted for by the county commissioners, without any authority of law.

Two particular items are mentioned as being contained in this last estimate; the one is for $2912, for masonry. If the contract for this item was let by the county commissioners at one time, they certainly had no authority either under the general law governing the letting of contracts by them, or under this road law, to let such contract without first advertising for bids for the same.

There may be some question as to whether the commissioners violated the law in this respect. This masonry may have consisted of separate jobs which, in the aggregate, make the amount, while no one job would amount to more than a thousand dollars. But as to the second item, being of the amount of $1,300, for scraping and rolling said Brecksville road, there does not seem to be any sufficient explanation. There is no showing that the bids for this work were invited by the commissioners as required by law, and that a contract was entered into with the lowest bidder; but the contract seems to have been given to contractor Miller without any competition. But there is a more serious objection to the payment of this amount than the fact that competition was not invited by the commissioners.

The original specifications, furnished as information for bidders and upon which the contract for the entire job was let, required "that the roadway will be formed into a smooth compact earth road," so that it would seem that a fair interpretation of the contract, and a compliance with its items would require that this work of scraping and rolling be performed by the contractor under his general contract so as to leave the road-bed in a smooth, compact condition.

Certainly if that is true, this item of $1,300 is unlawful.

And, in this second, I have embraced the third item, or reason.

Coming to the consideration of the fourth general reason given by the relator why the payment of this estimate should be enjoined, to-wit, that the contractor has already been grossly over-paid. And, considering that, I desire, first, to say, that the court does not intend to reflect at all upon the honesty of the board of county commissioners or the engineer in charge of the work.

It may be and, doubtless is true, that the commissioners of the county

were almost entirely dependent upon the engineer in charge of this work, and that the engineer himself, of necessity, was, to some extent, dependent upon those employed by him in making up the estimates as the work progressed.

But, for the purposes of this hearing, I think that it appears clearly from the evidence that there has been a gross misunderstanding of the meaning and intention of the specifications contained in this contract.

Under the specifications of hardpan and what it should include, I think, may be found the secret of the surprising cost of this improvement. And I think, not only the testimony of the various engineers, but the reading of the specification itself, should satisfy the court that the interpretation given to that specification by the engineer of this improvement and by his counsel in the trial of this case, is incorrect. Under subdivision 5 of the specification of this contract is found the following:

"Excavations shall be made and estimated by the cubic yard under the following heads: Namely, earth, hardpan, loose rock, and solid rock. Earth shall include clay, sand, gravel, loam, decomposed rock, and shale, stones, and bowlders containing less than one cubic foot, and all other matters of an earthy nature, however compact, excepting only hard-pan as described below.

"Hard-pan shall include tough laminated clay or cemented gravel which, in the judgment of the engineer, requires blasting or other equally expensive means for its removal."

I have read the definition of the two first subdivisions, of what should be included under the term "earth"; also, what should be included under the term "hard-pan".

Following those definitions are the definitions of what shall be included in loose rock and what shall be included under the head solid rock.

I think it will not be questioned that the purpose of these various subdivisions was to group, under each subdivision, such material as would

cost about the same for their removal. So that, under the head of earth, would be included those things which would cost about the same as earth. Under the head hard-pan should be included such materials as would cost about the same for their removal.

One of the controversies in this case is as to the meaning of this hardpan specification. It has been contended on the one hand, that hard-pan shall include tough laminated clay, without any qualification; that it was meant wherever there was clay that might be described as tough, laminated clay. That was included under the term hard-pan, and that nothing in that specification, after the word "clay", was intended to modify "tough, laminate clay" or throws any light upon the character of that material. So that wherever the engineer found that kind of clay, by right and reason of the specifications, he should include it under the specification "hard-pan".

It is contended, on the other side, that the whole specification altogether, explains what was meant by "tough laminated clay", and what kind of tough, laminated clay was to be included under the head of hard-pan. That the specification should be read altogether: "Hard-pan shall include tough laminated clay or a cemented gravel such as, in the judgment of the engineer, requires blasting or other equally expensive means for its removal."

And the contention on the part of the relator is, that only such tough laminated clay was to be included under the term "hard-pan" as was equally expensive in the means for its removal as cemented gravel which, in the judgment of the engineer, requires blasting; that is to say, that only such clay should be classified as "hard-pan", that was as expensive to remove as cemented gravel which requires blasting.

Now, I confess, that I can not read this specification any other way and satisfy myself that I am reading it correctly. For the specification preceding it, included clay, and not only ordinary clay, but clay, however com-

pact. So that there was·in the mind of whoever drew this specification, a difference between clay however compact, and tough laminated clay, and that was measured by the expensiveness of its removal. It must be of sufficient difference to put it in another specification along with cemented gravel which required blasting.

It can be readily seen that where a contract was entered into, like the one we are considering, in which the county was to pay but five cents a cubic yard for the removal of earth and sixty cents a cubic yard for the removal of material included under the head hard-pan, that the more of clay which should be included under the head of earth that may be included under the head hard-pan, the better for the contractor; for the price paid for every yard of the latter is equal to the price for twelve yards of the former.

But, it is said, that the engineer was made the sole judge and arbitrator of all questions that arise under this contract, and that if the county commissioners approved of the estimate of the engineer, there is no appeal therefrom.

I think it is not good law to say that where men occupying such positions as the county commissioners do, acting in a representative capacity for the taxpayers, if they are mislead or about to be mislead and to unlawfully pay out the money of the taxpayers—that the hands of the taxpayers are tied and he can not be heard to complain. I think it is also not good law to say that because the commissioners of the county have employed an engineer and clothed that engineer with all the power possible for them to confer upon him, and made him the arbiter of all questions that they have the right to make him the arbiter of, that if he makes a gross mistake or is mislead so far that he makes an estimate that is grossly unjust to the county and a wrong to the taxpayers thereof, that there is no remedy for the taxpayer, and that the contractor who has obtained such an estimate, although he is not justly entitled to the same, is entitled to its payment.

Supposing, for instance, that the mistake in this estimate and in all the estimates had been so gross that instead of paying for earth excavation at all, the engineer had allowed the contractor for hard-pan—supposing that he had allowed for solid rock when he should have only allowed for earth, and that that act was so apparent and so glaring that there was no question at all, would it be said that because the engineer had made the estimate and the commissioners had allowed the same, that the taxpayers' hands were tied and could not enjoin the payment or be heard to complain? There are other objections that have been raised to the payment of this estimate and given as reasons for the allowance of an injunction in this case, which have more or less force, but which the court has not taken the time to carefully examine or consider; to-wit, the allegation that there was no certificate from the county auditor or any clerk of the board of county commissioners to the effect that there was money in the treasury sufficient for the purposes of this contract, and that, consequently, the entering into this contract was illegal at its inception.

I only notice this far enough to say that one of the provisions of this road law was, that an engineer should be employed to make preliminary specifications and estimates of the cost of the improvement, and that one of the purposes and designs of that provision when the law was prepared was to inform the county commissioners as to the probable cost of the proposed improvement, so that they might be able to determine whether they had the money in the treasury sufficient for the work, or whether necessary steps had been taken to procure the same.

The design of the preliminary specifications was not principally to give bidders information as to the extent of the proposed improvement, though it furnished this information; but one of the principal purposes was to inform the county commissioners as to the probable cost of the proposed improvement.

The court is tempted here to say, in

conclusion, that the facts, as presented here by· this case, illustrate very forcibly the evils of the system of bidding under which this contract was let.

There does not seem to be any good reason, if a road is to be improved by the county commissioners, why they should not require plans and specifications to be thoroughly made, and the manner of making that improvement fully and completely determined, and then accept bids for the construction of that improvement according to the plans and specifications; in other words, accept bids for the complete job, what is known as a "flat bid". It certainly would close the door for all the difficulties that seem to have arisen in this case and swelled the cost of the improvement.

This is only an application for a temporary injunction, and, to some extent, no answer has been filed by the commissioners, and the hearing has been upon affidavits only.

When the issues are made up and witnesses are brought upon the stand in the trial of the case, it may present a very different phase to the court, but the relator has made out a case for a temporary injunction to the satisfaction of this court, and the same will be allowed.

White, Johnson & McCaslin, for Plaintiff.

Walter C. Ong and Alex. Hadden, for Defendants.